**Andrew TORRES; Amanda Torres, husband and wife; Walter Torres; Debra Torres, Plaintiffs–Appellants,**

v.

**GOODYEAR TIRE & RUBBER COMPANY, INC., an Ohio Corporation, Defendant–Appellee.**

No. 87–2062.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 18, 1988.

Prior Opinion Filed Sept. 15, 1988.

Order Withdrawing Prior Opinion and Opinion and Order Certifying Question to Arizona Supreme Court Filed Feb. 15, 1989.

Decided April 13, 1990.

Richard D. Engler, Engler, Engler, Weil & Nelson, Yuma, Ariz., for plaintiffs-appellants.

Jefferson L. Lankford, Jennings, Strouss & Salmon, Phoenix, Ariz., for defendant-appellee.

---

Before SNEED, HALL and NOONAN, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Because we set forth the factual details of this litigation in *Torres v. Goodyear Tire & Rubber Co., Inc.*, 867 F.2d 1234, 1235–36 (9th Cir.1989) [hereinafter *Torres I*], we merely summarize them here. Plaintiffs-appellants the Torreses sued to recover for personal injuries suffered as a result of an automobile accident. They asserted four theories under which they believe defendant-appellee Goodyear Tire & Rubber Company ("Goodyear") should be held liable for their injuries: (1) the "apparent manufacturer" doctrine; (2) principles of apparent agency or agency by estoppel; (3) the Arizona law of manufacturers' warranties; and (4) the "enterprise theory" of strict products liability.

The district court exercised diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). The district court granted summary judgment in favor of Goodyear, concluding that "neither the Arizona courts nor the Arizona legislature have accepted the expansive liability doctrines argued by the plaintiffs."

In *Torres I*, 857 F.2d at 1236–37, we affirmed summary judgment in favor of Goodyear on appellants' first three theories of liability. We then certified to the Arizona Supreme Court the remaining issue of whether appellants could rely on an "enterprise theory" to hold Goodyear strictly liable for their injuries. *Id.* at 1239.

The Arizona Supreme Court concluded that Arizona's common law and statutes would countenance the imposition of strict liability on trademark licensors significantly involved in the overall process by which the product reaches consumers. *Answer to Certified Questions*, 786 P.2d 939, 945 (Ariz.1990) [hereinafter *Torres II*]. Because we find Goodyear's involvement significant, we reverse and remand to the district court.

## I

Analyzing state common law, the Arizona Supreme Court noted that an underlying objective of strict liability doctrine is to shift the risk of loss to those "in the chain of distribution of defective, unreasonably dangerous goods." *Id.* at 942. The court eschewed semantic niceties about the terms "seller" or "manufacturer" in Comment f to § 402A of the Restatement (Second) of Torts,[1] and instead focused on the degree of control a trademark licensor exercised over the design, manufacture, and sale of the defective product. *Id.* at 943–44. It concluded:

> [A]s a common law matter, trademark licensors who significantly participate in the overall process by which the product reaches its consumers, and who have the right to control the incidents of manufacture or distribution, are subject to liability under the rules of Restatement § 402A as adopted and applied in Arizona. Like lessors of products, they are the functional equivalent of manufacturers and sellers.

*Id.* at 946.

There is no question that Goodyear's involvement in the overall process by which the tires in question reached the Torres' fits the above description. *See Torres*, 857 F.2d at 1235–36. Accordingly, the district court erred in ruling that Arizona common law rendered Restatement § 402A inapplicable.

## II

Turning to state statutory law, the Arizona Supreme Court acknowledged that there were no legislative provisions explicitly addressing the question of whether a trademark licensor should qualify as a "manufacturer" or "seller" for purposes of strict liability. *Torres II*, at 947. However, it also noted that the broad definition of "manufacturer" in Ariz.Rev.Stat.Ann.

---

1. Arizona adopted § 402A in *O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 559–60, 447 P.2d 248, 251–52 (1968). It also uses the terms "seller" and "manufacturer" in applying § 402A. *See id.* 103 Ariz. at 559, 447 P.2d at 251.

§ 12–681(1) [2] could encompass certain trademark licensors. The court concluded:

Surely the entity that dictates and controls the design, specifications for formulation, technique for production, quality of production, marketing, advertising, sale and warranty of a product can qualify as one "who otherwise prepares the product 'prior to its sale.'"

*Id.*

Because Goodyear's involvement was extensive, albeit indirect, *see Torres*, 857 F.2d at 1235–36, it fell well within the Arizona Supreme Court's interpretation of § 12–681. Thus, the district court's interpretation of Arizona statutory law was also erroneous.

### III

For these reasons, we REVERSE the district court's remaining order in this case that the Torres could not sue Goodyear under an "enterprise liability" theory of strict liability. We REMAND to the district court for further proceedings consistent with this opinion. REVERSED and REMANDED.

NOONAN, Circuit Judge, concurring:

I concur. There seems no reason not to give the district court the full benefit of the answer of the Arizona Supreme Court. Accordingly, I set out the substance of that opinion, written by Vice Chief Justice Stanley G. Feldman. Quotation marks should be imagined before "Both" and after the final "facts.":

Both Andrew and Walter Torres were injured in an automobile accident allegedly caused by tread separation of a Goodyear tire on a 1977 Triumph automobile driven by Walter. The tire was original equipment on the Triumph, which had been manufactured in Great Britain and which had been purchased by Walter's wife, Debra. The tire was marked "Goodyear."

The tire was manufactured by [Goodyear Tyre & Rubber (Great Britain)] (Goodyear GB) and designed by [Goodyear International Technical Center] (GITC). Specifications for the manufacture of the tire were issued by either [Goodyear SA of Luxembourg] (Goodyear Luxembourg) or Goodyear GB. *See* Goodyear's Answer to Plaintiffs' Second Set of Interrogatories No. 62, appended to Plaintiff's Separate Statement of Facts in Support of Plaintiffs' Response to Defendant Goodyear USA's Motion for Summary Judgment, filed Jan. 15, 1987. The European corporations mentioned are supervised by Goodyear International Corporation (Goodyear International). All of them—Goodyear GB, Goodyear Luxembourg and Goodyear International—are Goodyear subsidiaries and the stock in each, except for directors' qualifying shares, is owned by Goodyear. Through its stock ownership in the subsidiaries, Goodyear is able to elect directors to the boards of each subsidiary to ensure that they follow Goodyear's policies. Goodyear International's mail office is located in the United States in the same building as Goodyear's executive offices. As the [federal] court described it, there is "commonality between some of the officers and directors of Goodyear and its subsidiaries." *Torres II*, 867 F.2d at 1235.

Goodyear's actual ability to control Goodyear GB's production of Goodyear tires is pervasive. Either directly, or indirectly through its international subsidiaries, Goodyear has the ability to design the product, provides specifications for its manufacture, and control the method of manufacture and actual production of the tire. Goodyear has reserved the right to control the qualify of all tires manufactured by Goodyear GB. It sets warranty policy and honors valid warranty claims on all tires bearing the Goodyear trademark, even though, as in this case, they are actually manufactured by a subsidiary.

Goodyear's ability to control Goodyear GB is not confined to power asserted indirectly through common directors and officers. Goodyear and Goodyear GB have

---

**2.** Section 12–681(1) defines a manufacturer as one "who designs, assembles, fabricates, produces, constructs or otherwise prepares a product or component part of the product prior to its sale to a user or consumer ..."

entered into a licensing contract that permits Goodyear GB to manufacture Goodyear tires. The licensing agreement provides that tires will be manufactured in accordance with formulas, specifications, and directions given by Goodyear, and produced from materials approved by Goodyear. Goodyear GB is also required to comply with Goodyear's instructions on labeling, marketing, packaging, and advertising the tires.

With the perspective given by the foregoing facts, we turn now to the law of the state of Arizona.

## COMMON LAW STRICT LIABILITY

### A. Product Law in Arizona

This state long ago adopted the Restatement (Second) of Torts (Restatement) § 402 and recognized strict liability of manufacturers and sellers of defective products that were unreasonably dangerous and caused physical harm to the consumer or his property. *O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 559–60, 447 P.2d 248, 251–52 (1968). The evolution of the doctrine in Arizona is described in *Stapley* and in *Tucson Industries, Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936 (1972), and need not be repeated here. Both the Restatement and our cases have used the terms "manufacturer" and "seller" almost interchangeably in applying the doctrine. *See* Restatement § 402A comment f; *Stapley*, 103 Ariz. at 559, 447 P.2d at 251; *Schwartz*, 108 Ariz. at 466–68, 501 P.2d at 938–40.

The underlying objective of the doctrine was to place the risk of loss on those in the chain of distribution of defective, unreasonably dangerous goods. *Schwartz*, 108

Ariz. at 467, 501 P.2d at 939. The doctrine was considered a

> policy device to spread the risk from one to whom a defective product may be a catastrophe, to those who marketed the product, profit from its sale, and have the know how to remove its defects before placing it in the chain of distribution.

*Id.* at 467–68, 501 P.2d at 939–40. Given the policy formulation underlying strict liability, the degree of control possessed by Goodyear in the case before us is a factor that militates in favor of applying strict liability to such licensors.[2]

These policy considerations have impelled our courts to abjure technical definitions in defining the categories of enterprise to which the doctrine of strict liability should apply. Among those who are neither manufacturers or sellers, but who were involved in the chain of production or distribution of the product and have been subjected to strict liability, are lessors of products, donors of products, and dealers in used goods. *See, e.g., Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.*, 135 Ariz. 309, 660 P.2d 1236 (Ct.App.1983) (used goods); *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326 (Ct.App. 1978) (donor of pharmaceutical product); *Sequoia Mfg. Co. v. Halec Const. Co.*, 117 Ariz. 11, 570 P.2d 782 (Ct.App.1977) (lessor of product).

In applying the doctrine of strict liability to a lessor, our court of appeals refused to distinguish between the liability of a [Arizona state] dealer who sold a defective automobile and one who leased the automobile. Specially concurring, Judge Jacobson wrote as follows:

[Footnote 1 is omitted]

2. Goodyear suggested at oral argument that it is one thing to have the right of control and another to use it, and pointed out that this record does not establish whether or to what extent Goodyear actually exercised its right of control. This may be correct, but we give it little weight. The record also contains no evidence that Goodyear refrained from exercising its power of control, either directly or indirectly. It would be naive, indeed, for this court to conclude that although the largest tire manufacturer in the

> world had complete power to control subsidiaries, it allowed them to do whatever they wished in the design, manufacture, and distribution of a product the licensor spent many millions of dollars to advertise as a symbol of quality. Of course, we leave to the circuit court the prerogative of making whatever assumptions it feels are appropriate in light of the record, but we believe it would defy economic reality to assume Goodyear is indifferent to the manufacturing policies of the wholly owned subsidiaries it licenses to produce its products.

754

The distinction to be made is not in what capacity the dealer acts, that is, as seller or lessor, but in the nature of the defect itself, that is, was it the result of either design or manufacture?

*Lechuga, Inc. v. Montgomery,* 12 Ariz. App. 32, 38, 467 P.2d 256, 262 (1970).

We believe the decisions cited fairly indicate that in Arizona the application of strict liability does not hinge on the technical limitations of the term seller or manufacturer as used in Restatement § 402A. As Judge Jacobson indicated, "the term 'seller' is a term designating a class (one in the business of placing products in the stream of commerce) rather than a designation of limitation." *Id.*

Arizona has not yet decided whether trademark licensors may be held strictly liable for defects in the licensed product, although the application of strict liability to trademark licensors has been intimated on at least two occasions. *See Lechuga,* 12 Ariz.App. at 38, 467 P.2d at 262; *Nalbandian v. Byron Jackson Pumps, Inc.,* 97 Ariz. 280, 288, 399 P.2d 681, 686 (1965) (Lockwood, J., concurring). If we ignore the label of trademark licensor and consider only the policy objectives underlying the adoption of strict liability as described in *Schwartz,* we must focus our analysis on the character of the injury-producing conduct rather than the technical limitations of the term seller. Using this approach, the facts of this case place Goodyear well within the class mentioned by Judge Jacobson of those "in the business of placing products in the stream of commerce," and subject to the doctrine of strict liability. *Lechuga,* 12 Ariz.App. at 38, 467 P.2d at 262.

B. Corporate Form

In arguing that it should not be held strictly liable, Goodyear relies heavily on the separate corporate identities of each of its subsidiaries. It points out that the corporate forms were strictly maintained—as we have no doubt is the case—and that courts should not ignore corporate organization. We have no intention of doing so, but we do not believe it is good law to allow multinational firms the freedom to compartmentalize strict liability by choosing organizational forms that will require actions for defective design of a product such as this to be brought in Luxembourg, those for defective manufacture in Great Britain, those for defective labeling in a third, and the like. Goodyear, after all, does business in some fifty countries and no doubt places its different subsidiaries that contribute to research, design and distribution in whatever location it finds most conducive to its economic wellbeing. We presume it is guided in these decisions by the realities of the marketplace.

This court must also acknowledge the realities of the marketplace when it decides cases. *See, e.g., Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200 (1983). The marketplace, as described by the facts of this case, indicates very clearly that we deal with a tire designed to be a Goodyear tire, produced, packaged, advertised, and sold as a Goodyear tire, and warranted by Goodyear. To hold, as we are asked, that when the product is defective and unreasonably dangerous it should not be considered a "Goodyear" tire but a "Goodyear GB" tire would be to espouse a doctrine that would no doubt surprise most Goodyear customers, and perhaps some officers of Goodyear itself.

C. Other Authority

Nor have we been cited to any case that holds, under similar facts, that the doctrine of strict liability should not apply to a trademark licensor. Actually, many courts considering the issue have instead taken the view that strict liability should be applied. For example, in a case very similar to the present case, a plaintiff sought to impose strict liability on Uniroyal, Inc. for injuries caused by an allegedly defective tire manufactured and sold by Uniroyal's Belgian subsidiary, Uniroyal Englebert Belgique, S.A. *Connelly v. Uniroyal, Inc.,* 75 Ill.2d 393, 27 Ill.Dec. 343, 389 N.E.2d 155 (1979), *cert. denied and appeal dismissed,* 444 U.S. 1060, 100 S.Ct. 992, 62 L.Ed.2d 738 (1980). Noting that strict liability was intended "to place the loss caused by defective products on those who create the risk

and reap the profit," the Illinois Supreme Court held as follows:

A licensor is an integral part of the marketing enterprise, and its participation in the profits reaped by placing a defective product in the stream of commerce ... presents the same public policy reasons for the applicability of strict liability which supported the imposition of such liability on wholesalers, retailers and lessors. The societal purposes underlying [*Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182 (1965)—the case adopting strict liability in Illinois] mandate that the doctrine be applicable to one who for a consideration, authorizes the use of his trademark, particularly when, as here, the product bears no indication that it was manufactured by any other entity.

*Id.* 75 Ill.2d 393, 27 Ill.Dec. at 351, 389 N.E.2d at 163; *see also Molett v. Penrod Drilling Co.*, 826 F.2d 1419 (5th Cir.1987) (non-manufacturer/seller liable when its relationship with the actual manufacturer makes it capable of controlling the quality of the merchandise); *Taylor v. General Motors, Inc.*, 537 F.Supp. 949, 952–53 (E.D. Ky.1982) (as a franchisor, General Motors exercised strict control over the design and testing of the product and therefore was "an integral part of the composite business enterprise" that was responsible for placing the fans "in the stream of commerce"); *Kasel v. Remington Arms Co.*, 24 Cal. App.3d 711, 101 Cal.Rptr. 314 (1972) (franchisors of trademark licensors that are links or participants in the marketing enterprise that results in product entering stream of commerce are strictly liable in tort); *City of Hartford v. Associated Const. Co.*, 34 Conn.Sup. 204, 384 A.2d 390 (1978) (trademark licensor of roofcoating product strictly liable in tort for property damage caused by defects in its product); facts showed licensor participated in formulation, design, manufacture, distribution, sale, and advertising of product to similar extent as Goodyear in present case; *Ogg v. City of Springfield*, 121 Ill.App.3d 25, 76 Ill.Dec. 531, 458 N.E.2d 1331 (1984) (parent company that participates in manufacture, marketing, and distribution and is in position to eliminate unsafe character of

product held strictly liable). Other cases are cited in *Torres II*, 867 F.2d at 1238.

Goodyear argues that none of the cases cited stands for the proposition that a mere trademark licensor can be held strictly liable in tort. It points out that in each of the cases, the facts showed the licensor was "integrally involved in the overall producing and marketing enterprise [so] that strict liability will follow." Brief at 16 (quoting *Hebel v. Sherman Equipment*, 92 Ill.2d 368, 65 Ill.Dec. 888, 442 N.E.2d 199, 205 (1982)). Goodyear is correct, but its analysis of the cases does not help its cause. If ever a defendant was involved "in the direct chain of sale leading from manufacturer to consumer" (*id.*), it is Goodyear. Goodyear evidently distinguishes these cases by an implicit extra step we refuse to take. It apparently believes that because its participation in research, design, manufacture, distribution, and sale was technically accomplished through its wholly owned subsidiaries, Goodyear is not responsible for losses caused by a defective, unreasonably dangerous product produced by the common enterprise. We do not share this view. The parent company owns the subsidiaries, designates their directors and officers, allocates the capital needed and used by the subsidiaries, and enjoys the profits made by them. Certainly the brain that so competently and thoroughly directs the entire enterprise must be liable for the acts of its appendages.

The application of strict liability to trademark licensors such as Goodyear has been endorsed by various commentators. For example:

It can be said that all those who participate in the process of making products available to users for profit or financial gain are subject to liability on a negligence theory. This would include endorsers, *licensors of trademarks*, and franchisers, . . . .

The more difficult inquiry relates to strict liability. . . . The states that have passed on the question have treated the franchiser as if he were the seller, at least in those cases where many mem-

bers of the general public would believe that the franchiser was either the owner, seller or at least exercising substantial control over the franchisee's processes. The licensor of a patent is often in a somewhat different position. The licensor's contract is generally nothing more than a contract authorizing the use of an alleged patent, i.e., an invention. The product sold by the licensee is generally not sold under the trade name of the licensor of the patent. The general public is not in most instances relying on the licensor. *This is not to say the licensor may not participate to such an extent in the construction and sale of products made pursuant to a patent to justify the imposition of strict liability.* PROSSER AND KEETON ON THE LAW OF TORTS § 100 (5th ed. 1984) (emphasis added); *see also* 2 L. FRUMER AND M. FREEDMAN, PRODUCTS LIABILITY § 3.03[4] (1988) ("We submit that the decisions [imposing strict liability] are correct and consistent with both the growth of strict products liability law and the increasing use of trademark and licensing agreements. To hold otherwise would insulate from strict product liability a substantial number of culpable distributers of defective products.").

We believe the comment quoted from Prosser accurately describes the proper common law rule. If we were to deal with "nothing but a mere licensor"—one who merely licenses a manufacturer to use a particular patent or trademark—it might well be inappropriate to impose strict liability. However, this is not an issue we need to decide today because the facts set forth in this opinion show that Goodyear is anything but a mere licensor. On the present record before us, the undisputed facts certainly could support a finding that Goodyear participated significantly in the de-

sign, manufacture, promotion, and sale that resulted in the product reaching the consumer. Because strict liability is the law in Arizona, there exists no justification based in theory or precedent for failing to apply it to such a licensor.

### D. Economic Considerations

The Ninth Circuit majority [in *Torres II* ], however, was concerned with some economic considerations that are commonly considered by the school of law and economics. At least implicitly, we were asked to consider such matters. The court pointed out that it is "now realized that the cost of 402A insurance is very substantial" so that we are "approaching the time when fundamental assumptions with respect to § 402A will be reexamined." [3] *Torres II,* 867 F.2d at 1238. The court went on to state:

> Questions will be raised such as: should universal compensation ... be provided by a form of national accident insurance exclusively? Or should a plan employ a combination of (a) national accident insurance, (b) individual accident insurance, (c) and a tort system based on fault? If these are visionary, should § 402A be redrawn so as to make its outer limits more precise? Or should we merely halt for the present the expansion of § 402A by judicial decision?

*Id.* at 1239.

We do not believe any of these issues, if they be that, are relevant to the present problem of whether a tire conceived and sold as a Goodyear tire for all purposes should not also be considered a Goodyear tire when it fails. We are unaware of any process by which product liability insurance premiums in the relevant economic universe will be reduced by even a trickle if the insurers for Goodyear Luxembourg or

---

**3.** We do not know which "fundamental assumptions" the court referred to. This court makes no fundamental assumptions regarding section 402A except that those who distribute defective and unreasonably dangerous products should pay for the damage they cause. If this is a fundamental assumption, it is one basic to both tort and criminal law. The court in *Torres II* suggests no better substitute for this rationale.

As to the performance of product liability law in general, see HUMAN RESOURCES DIVISION, U.S. GENERAL ACCOUNTING OFFICE, PRODUCT LIABILITY: VERDICTS AND CASE RESOLUTION IN FIVE STATES [including Arizona], Report to the Chairman, Subcommittee on Commerce, Consumer Protection, and Competitiveness, Committee on Energy and Commerce, House of Representatives, (Sept.1989).

Goodyear GB rather than those for Goodyear (if there is any difference in identity between such insurers) pay the loss. Of course, it is possible that if Goodyear is not strictly liable, and *in personam* jurisdiction cannot be obtained over Goodyear GB and Goodyear Luxembourg,[4] there may be no recovery possible to compensate plaintiffs for their injuries.[5] In the absence of tort recoveries, of course, there is hope that premiums will decrease. Denying recovery to those entitled to compensation may be an effective method of reducing insurance premiums, but it hardly appears to be the optimum approach. Moreover, the grant of immunity to the American parents of foreign manufacturing subsidiaries combined with the difficulties of obtaining *in personam* jurisdiction over such foreign subsidiaries may well encourage the transfer of American manufacturing jobs to other countries. We do not believe this is good legal or economic policy.

Nor do we believe the other aspects of "economic reality" raised by the majority in *Torres II* are within our power to change. Whether there should be a system of universal compensation, national accident insurance, or individual accident insurance is a matter for the legislative forum, just as would be the necessary funding for such a system. Our responsibility is to establish and apply rational rules of tort law. To hold that this tire is not a Goodyear tire would exalt form over substance. In essence, we are asked to close our eyes to economic reality and adopt a rule for tort law that no court and legal commentator has yet recommended, so far as is shown by any citation provided us. Such a regime of tort law would not accomplish anything significant to ameliorate the problems that afflict the insurance industry. Regulation of the insurance industry cannot, and should not, be accomplished by making bad tort law.

We conclude, therefore, as a common law matter, trademark licensors who significantly participate in the overall process by which the product reaches its consumers, and who have the right to control the incidents of manufacture or distribution, are subject to liability under the rules of Restatement § 402A as adopted and applied in Arizona. Like lessors of products, they are the functional equivalent of manufacturers and sellers.

Because the liability question posited in *Torres II* also takes cognizance of Arizona statutes dealing with products liability, we turn next to an analysis of those statutes and their effect on this case.

## PRODUCT LIABILITY UNDER ARIZONA STATUTE

In 1978, our legislature adopted a series of statutes under the heading "Product Liability." *See* A.R.S. §§ 12–681 to 12–686. The legislative goal was to address the "perceived crisis of rising products liability insurance rates" and to promote new product development by controlling or regulating product liability law. *See Bryant v. Continental Conveyor Equip. Co.*, 156 Ariz. 193, 197, 751 P.2d 509, 513 (1988).[6]

---

**4.** *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Batton v. Tennessee Farmers Mut. Ins. Co.*, 153 Ariz. 268, 736 P.2d 2 (1986).

**5.** This issue may be of more than academic interest here. Although Goodyear claims plaintiffs were granted permission to add the tire manufacturers as defendants, *see* Appellee's Brief at 2, the district court docket sheet indicates an order was entered on December 3, 1986 denying plaintiffs permission to amend the complaint to add Goodyear GB and Goodyear International as party defendants.

**6.** So far as we can determine, the adoption of these statutes had not accomplished the legislature's goals. Premiums for Arizona manufacturers are not reported to be lower than those in other places, and we have noticed no trend of manufacturers fleeing California and locating in Arizona, where the reduced exposure to strict liability in tort would promote the development of new products. Indeed, it appears that in California, where under the *Kasel* rule a trademark licensor is strictly liable in tort, there has been a great influx of capital, leading to the establishment of many new firms specializing in the development of new, "hi tech" products. We are aware, of course, that development of some types of new products, such as certain drugs, may be more directly affected by product liability law. *See, e.g.*, Restatement § 402A comment K (immunizes manufacturers of some products that are unavoidably unsafe); *Feldman v. Lederle Laboratories*, 97 N.J. 429, 479 A.2d 374, 380–81 (1984) (although generally principle

First, it is important to note that the statutes expressly disclaim any limitation of the existing common law of product liability. *See* A.R.S. § 12–682. Nor do the statutes attempt to oust this court from the evolution of product liability law. They purport to do no more than establish certain affirmative defenses (A.R.S. § 12–683, pertaining to the so-called "state of the art" defense, alteration or modification as a defense, and abuse of the product); provide for indemnification between manufacturers and sellers (A.R.S. § 12–684); regulate the contents of *ad damnum* clauses (A.R.S. § 12–685); and deal with evidentiary issues pertaining to remedial measures (A.R.S. § 12–686). No provision of the statute deals with the question of whether a lessor, a donor, a franchisor, a trademark licensor, or any similar entity should qualify as a manufacturer or seller.

In defining the terms, however, the statute defines manufacturer in very broad terms: one who "designs, assembles, fabricates, produces, constructs or otherwise prepares a product or component part of a product...." A.R.S. § 12–681(1). Plaintiffs argue that the term "otherwise prepares a product" applies to Goodyear. We agree. Surely the entity that dictates and controls the design, specifications for formulation, technique for production, qualify of production, marketing, advertising, sale, and warranty of a product can qualify as one who "otherwise prepares" the product "prior to its sale." A.R.S. § 12–681(1). We believe that even if the statutes were intended to restrict what the court described in *Torres II*, 867 F.2d at 1239, as the "outer limits" of section 402A, Goodyear falls well within the definition of manufacturer in A.R.S. § 12–681.

We conclude, therefore, that there is nothing in the statutes that would prohibit or conflict with the application of the doctrine of strict liability in tort to Goodyear.

### CONCLUSION

The answer to the question certified and accepted is that under Arizona law a trade-

mark licensor may be held liable where a licensee marketed the defective, unreasonably dangerous product as the licensor's, where the licensor's relationship with the technical manufacturer or seller made it a significant participant in the enterprise by which the product is brought to market, and where the licensor controlled or had the ability to control the design, manufacture, or quality of the merchandise. Of course, we considered this case under the record provided us, essentially one involving summary judgment proceedings, and make no prediction as to the actual state of facts that may ultimately be established in this case or the proper outcome of the case when the legal principles we enunciate here are applied to the facts.

---

of strict liability is applicable to manufacturers of prescription drugs, in some circumstances doctrine of strict liability may be inapplicable). If special exceptions are required for such prod-

ucts, it might be appropriate to consider such rules when the cases are presented. But here we deal with tires, not a new vaccine for AIDS.