[No. D018345. Fourth Dist., Div. One. Dec. 16, 1996.]

BAY SUMMIT COMMUNITY ASSOCIATION et al., Plaintiffs and Respondents, v.
SHELL OIL COMPANY et al., Defendants and Appellants.

## COUNSEL

Musick, Peeler & Garrett, William R. Warhurst, Schiff, Hardin & Waite, Roger Pascal, Darren Van Puymbrouck, Catherine Masters Epstein, Fabris, Burgess & Ring, David D. Ring, Barri Kaplan Bonapart and Karen M. Porter for Defendants and Appellants.

Gerard, Selden, Osuch & Johnson, Lynde Selden II, Kathryn L. Johnson, Richard H. Benes and Mark R. Lippman for Plaintiffs and Respondents.

## OPINION

**HALLER, J.**—The developer of a condominium development, Bay Summit, installed polybutylene plumbing in the individual condominium units and in the common areas. After the plumbing developed numerous leaks, the Bay Summit Community Association and individual homeowners (plaintiffs[1]) sued numerous entities, including United States Brass Corporation (U.S. Brass), a polybutylene plumbing manufacturer, and Shell Oil Company (Shell), a supplier of resin for the polybutylene pipes. Plaintiffs alleged the plumbing leaked because of defective fittings used in the polybutlene plumbing system. When the jury reached its verdict, plaintiffs had settled with all defendants except U.S. Brass and Shell.

The jury found U.S. Brass and Shell committed fraud and were strictly liable for damages caused by the defective fittings in the polybutylene plumbing system. The jury awarded plaintiffs $89,035.85 in compensatory damages, for which it found Shell to be 10 percent liable and U.S. Brass 55

---

[1]The individual plaintiffs are Don and Glenda Blair, Sandra Dormal, Louis and Emily Farkas, Phillip and Diane Jemmett, Jacqueline Jean, Jonathan and Sue Lee, Laura Lowe, John and Bok Sun Lusignan, Lynn Maier, Ronald and Carol Priscilla, Deborah and Lynn Rovsek, and Edward and Ellen Wong.

percent liable.[2] The jury assessed $14,014 in punitive damages against Shell and $63,816 in punitive damages against U.S. Brass. After offset of sums paid in settlement by other defendants, Shell and U.S. Brass's compensatory damage liability was reduced to zero.

Shell appeals,[3] arguing the judgment cannot be sustained on fraud or strict liability grounds. Shell contends the fraud verdict was improper because plaintiffs were not required to, and did not, establish they relied on Shell's representations. Plaintiffs concede they did not prove reliance and that under the recent decision in *Mirkin* v. *Wasserman* (1993) 5 Cal.4th 1082 [23 Cal.Rptr.2d 101, 858 P.2d 568], they were required to establish reliance to prove fraud.[4] Based on this concession, we hold the judgment must be reversed with respect to the fraud claim, including the punitive damages award.

Shell additionally contends that because it was merely a supplier of a nondefective product (resin) it may not be held strictly liable to plaintiffs. Plaintiffs counter that Shell was properly held strictly liable based on its extensive involvement in the marketing and distribution of the defective polybutylene plumbing system. We conclude Shell is potentially subject to strict liability, but the trial court prejudicially erred in instructing the jury on the scope of a strict liability claim. Accordingly, we reverse the judgment on the strict liability claim.

## FACTUAL AND PROCEDURAL BACKGROUND[5]

### A.  *The Polybutylene Plumbing System*

U.S. Brass and Vanguard Plastics, Inc. (Vanguard) each manufactured a substantially identical polybutylene plumbing system. The system consisted of several parts: (1) polybutylene pipes, (2) T-shaped plastic fittings, (3)

---

[2]Although the jury apparently attributed the remaining percentage of fault to another entity (or entities), the record is not entirely clear on this matter since the verdict form on the liability phase is not part of the appellate record.

[3]U.S. Brass also filed a notice of appeal. However, it subsequently petitioned for a chapter 11 bankruptcy. The petition, which is still pending, stayed U.S. Brass's appeal. (11 U.S.C. § 362; see *Ingersoll-Rand Financial Corp.* v. *Miller* Min. Co. (9th Cir. 1987) 817 F.2d 1424, 1426-1427; *Assoc. of St. Croix Condo Owners* v. *St. Croix Hotel* (3d Cir. 1982) 682 F.2d 446, 449; see also *Shah* v. *Glendale Federal Bank* (1996) 44 Cal.App.4th 1371, 1377, fn. 5 [52 Cal.Rptr.2d 417].) We therefore decide only Shell's appeal in this opinion.

[4]*Mirkin* held a plaintiff must prove actual reliance to establish fraud and that the "fraud-on-the-market" doctrine is inapplicable in a common law fraud action based on statements made concerning a corporation's financial condition. (*Mirkin* v. *Wasserman, supra*, 5 Cal.4th at pp. 1088-1108.)

[5]Because plaintiffs concede the fraud issue, we do not set forth the facts underlying plaintiffs' fraud claim, except to the extent such facts relate to plaintiffs' strict liability claim.

metal rings, and (4) installation tools. The manufacturers made the pipes and fittings each from a different material. The pipes were made from polybutylene resin supplied in pellet form by Shell. The fittings were made from a plastic material described as an "acetal copolymer" supplied by Hoechst Celanese Corporation (Celanese). Celanese sold the material under the trade name Celcon.

After purchasing the parts, a plumber would attach the polybutylene pipes together by placing a Celcon fitting between the pipes, positioning the metal ring over the connection between the pipe and the fitting, and crimping the ring with a large crimping tool.

## B.  *Plumbing at Bay Summit*

In approximately September 1980, Bay Summit's developer contracted with Ted Whitt Plumbing (Whitt) to install polybutylene plumbing at the condominium development. During the latter part of 1980, Whitt installed Vanguard and U.S. Brass polybutylene plumbing systems at Bay Summit.[6] In January 1981, the Bay Summit project was completed. The individual plaintiffs first purchased their condominiums in May 1982.

Thereafter, owners of 12 condominiums experienced leaks in their plumbing systems, resulting in physical damage to each of their homes, including ceilings and walls. These owners sued the developer, the plumbing contractor (Whitt), the two manufacturers of the polybutylene plumbing system (Vanguard and U.S. Brass), Shell, and Celanese. Plaintiffs sought to recover the cost of the property damage caused by the plumbing system defects, plus punitive damages. All the defendants, except U.S. Brass, Shell, and Celanese settled before trial. Celanese settled with plaintiffs during jury deliberations.

## C.  *Evidence Presented at Trial*

At trial, plaintiffs presented evidence that the polybutylene plumbing system leaked primarily because of the defective *Celcon fittings*. The evidence showed the Celcon material was hypersensitive to chlorine and to other oxidizing agents and acidic conditions. Additionally, the fittings would often crack because of their sensitivity to environmental stress.

Plaintiffs further presented evidence showing Shell was aware the Celcon fittings were defective, but failed to disclose the defects. For example, in

---

[6]At trial, U.S. Brass vigorously argued the pipes and fittings found at the Bay Summit condominium complex were exclusively Vanguard polybutylene systems. The jury rejected the argument. Because the specific issue is not raised by the parties in this appeal, we assume for purposes of this appeal that the jury's finding was supported by the evidence.

March 1981, Shell's marketing director wrote to a manufacturer, confirming that "[Shell's] field sales staff do not make any statements to prospective customers about the potential problems with Celcon. If we did so, the information would quickly spread and frustrate all of our efforts to extend the penetration of polybutylene plumbing systems into the marketplace." Shell also attempted to internally develop its own fitting material because of the potential problems with Celcon.

Plaintiffs did not present any evidence of a defect in Shell's resin or that Shell's resin was used in the defective fittings. Plaintiffs' theory for holding Shell strictly liable was instead based on evidence showing Shell played a prominent role in the marketing of polybutylene pipes and the polybutylene plumbing system for new homes in the late 1970's and early 1980's. According to a 1981 memorandum written by Shell's polybutylene sales manager, Anthon Schroer, Shell's involvement was necessary "[b]ecause [Shell's] customers [the manufacturers] are, with one exception, small companies [and therefore] [Shell] must take an active role in promoting polybutylene plumbing systems until our customers become strong enough to completely assume that responsibility." Schroer explained the wholesalers did "not have the resources or the inclination . . . required to get code approvals and teach plumbers how to use the product. They . . . must have a market created for them."

To achieve its goal of developing the residential polybutylene plumbing market "as rapidly as possible," Shell engaged in numerous forms of marketing activities. Because an understanding of the nature of Shell's activities is essential to resolving the issues raised on appeal, we set forth the relevant evidence in some detail.

### 1. Direct Marketing Assistance to Manufacturers

During the late 1970's and early 1980's, Shell provided substantial marketing assistance to polybutylene plumbing system manufacturers. For example, Shell developed materials for use by U.S. Brass sales representatives, including a slide presentation and a publication providing answers to technical questions about polybutylene plumbing. Shell's marketing personnel spoke at U.S. Brass sales meetings and provided written information, including copies of Shell's polybutylene plumbing marketing guide.

Shell also initiated the formation of the polybutylene product committee, a subgroup of a larger trade organization. At a 1979 meeting, a Shell executive stated the purpose of the group would be to "promot[e] and protect[] . . . the interests of producers of polybutylene products." The executive explained

that the committee would offer assistance to all "[polybutylene] pipe and fittings producers." Shell personnel also reported on Shell's efforts to gain acceptance of the polybutylene plumbing system throughout the country. Shell provided the major portion of the initial funding for the group, fifteen times that of any other group member. Manufacturers of the polybutylene plumbing system and of the Celcon fittings attended the meeting and were members of the committee.

### 2. Marketing Directed at Homebuilders and Plumbers

In addition to assisting the manufacturers and devising marketing strategy, Shell directly promoted the polybutylene plumbing system to the purchasers of the plumbing system, including homebuilders and plumbers. Shell published a newsletter called "The Polybutylene Piper," aimed at "building credibility" for polybutylene plumbing. Shell sent this quarterly publication to the "top" builders and contractors, "influential building code officials," and people inquiring about the polybutylene plumbing system.

Shell also displayed the polybutylene plumbing system at trade shows. For example, in January 1978, Shell had a booth at the National Association of Home Builders Show, showing the advantages of polybutylene pipe, lists of various plumbing codes, and fittings used in polybutylene plumbing systems. A memorandum noted the attendance to the Shell exhibit "was beyond all expectations" and "was, beyond a doubt, one of the most successful that Shell has participated in—ever—even though the audience was made up of *not* our customers but our customers['] customer." (Italics in original.)

Shell's promotional programs also consisted of trade journal advertising. At trial, a plumber testified that he became aware of polybutylene plumbing by reading trade magazines and at trade shows. Based on this information, it was his understanding that Shell was promoting the plumbing product.

### 3. Code Approvals

In the late 1970's and early 1980's, Shell committed substantial resources to obtaining model code approval for polybutylene plumbing throughout the country. In the western states, the Uniform Plumbing Code is established by the International Association of Plumbing and Mechanical Officials (IAPMO), composed of plumbing contractors or former plumbers, and building officials. Changes to the uniform code must be approved by a majority vote at annual IAPMO meetings.

At the 1980 IAPMO annual meeting, only 10 percent of the members voted in favor of approving the polybutylene plumbing system. The next

year, Shell mounted an aggressive campaign to "influence and educate" the IAPMO membership. This campaign included personal meetings with the voters, providing each convention member with a packet of promotional information, displaying pipe and fitting samples, and arranging several builders and contractors to speak in favor of polybutylene plumbing at the convention. At the 1981 convention, Shell's efforts were successful since a majority of the committee members voted in favor of approving polybutylene plumbing.

Shell personnel also presented information about the polybutylene plumbing system to governmental bodies, such as the California State Department of Housing and Community Development. Shell arranged "to have satisfied [polybutylene] users . . . counter any negative arguments presented [concerning] . . . failures and leaks with flare fitting systems . . . ." Shell personnel also engaged in such activities as contacting an administrator of the Texas Board of Plumbing Examiners, seeking to include test questions concerning polybutylene plumbing in licensing examinations.

### 4. *Marketing Blitzes*

In areas where polybutylene plumbing was approved for use, Shell engaged in "blitzes," e.g., short-term intensive marketing campaigns. Shell sought to achieve market "penetration" by doing such things as having its employees ride with manufacturers' representatives and make joint calls, set up training programs with sales people, contact homebuilders associations and project managers, and arrange training seminars for plumbing inspectors.

### D. *Jury Instructions and Verdict*

Before and during trial, Shell maintained it could not be held strictly liable to plaintiffs since it did not design, manufacture, or sell the defective fittings. The court rejected the argument, and gave the jury several of plaintiffs' proposed instructions, informing the jury that Shell could be held strictly liable based on its involvement in marketing the polybutylene plumbing system. (See pt. II, *infra*.) Based on these instructions, the jury found Shell strictly liable for the defects in the Celcon fittings used in the polybutylene plumbing system.

Shell appeals.

DISCUSSION

I.   <em>Shell Is Subject to Strict Liability</em>

Shell maintains it could not be held strictly liable for the defective Celcon fittings or the polybutylene plumbing system because it was an

" 'upstream' supplier of a nondefective product." ▓ Shell relies on a line of cases holding an entity supplying a nondefective raw material or a component part is not strictly liable for defects in the final product over which it had no control. (See *Lee* v. *Electric Motor Division* (1985) 169 Cal.App.3d 375, 385-387 [215 Cal.Rptr. 195]; *Wiler* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 629 [157 Cal.Rptr. 248]; *Walker* v. *Stauffer Chemical Corp.* (1971) 19 Cal.App.3d 669, 674 [96 Cal.Rptr. 803].) ▓ Shell argues the "logic" of these decisions "compels reversal of the judgments for strict liability against Shell."

Shell's argument is flawed. Plaintiffs did not seek to hold Shell strictly liable based on its role as a supplier of resin. Rather, plaintiffs' theory at trial focused on Shell's participation in the marketing and distribution of the polybutylene plumbing system. Thus, the issue for our consideration is whether Shell's supplying the nondefective resin, *in combination with Shell's marketing activities*, warrants holding Shell strictly liable under the circumstances. The resolution of this issue requires that we examine the contours of the strict liability doctrine.

▓ Our high court first adopted the strict liability doctrine in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], holding "[a] manufacturer is strictly liable [to consumers] when an article [it] places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." *Greenman* reasoned the doctrine would "insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Id.* at p. 63; see *Anderson* v. *Owens-Corning Fiberglas* Corp. (1991) 53 Cal.3d 987, 995 [281 Cal.Rptr. 528, 810 P.2d 549].) The court recognized imposing strict liability would discourage the marketing of unsafe products and was necessary to "protect[] . . . consumers in an increasingly complex and mechanized society . . . ." (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 733 [144 Cal.Rptr. 380, 575 P.2d 1162]; *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d at p. 63; *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461 [150 P.2d 436].)

One year later, the court extended the strict liability doctrine to retailers because retailers "are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. [Citation.]" (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168].) *Vandermark* explained that holding retailers strictly liable would (1) enhance product safety since retailers are in

a position to exert pressure on manufacturers; (2) increase the opportunity for an injured consumer to recover since the retailer may be the only entity "reasonably available" to the consumer; and (3) ensure fair apportionment of risk since retailers may "adjust the costs of such protection between them in the course of their continuing business relationship." (*Id.* at pp. 262-263.)

■ The courts have since applied the doctrine to others similarly involved in the vertical distribution of consumer goods, including lessors of personal property (see *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245 [85 Cal.Rptr. 178, 466 P.2d 722]), developers of mass-produced homes (*Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749]), wholesale and retail distributors (*Barth* v. *B.F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228 [71 Cal.Rptr. 306]), and licensors (*Garcia* v. *Halsett* (1970) 3 Cal.App.3d 319 [82 Cal.Rptr. 420] [an operator of a laundromat]). Although these defendants were not necessarily involved in the manufacture or design of the final product, each was responsible for passing the product down the line to the consumer. Thus, the parties were "able to bear the cost of compensating for injuries" (*Price* v. *Shell Oil Co.*, *supra*, 2 Cal.3d at p. 252) and "play[ed] a substantial part in insuring that the product [was] safe or . . . [were] in a position to exert pressure on the manufacturer to that end." (*Vandermark* v. *Ford Motor Co.*, *supra*, 61 Cal.2d at p. 262.)

Relying on these same policy justifications, California courts have further recognized the doctrine extends to nonmanufacturing parties, outside the vertical chain of distribution of a product, which play an integral role in the "producing and marketing enterprise" of a defective product and profit from placing the product into the stream of commerce. (*Kasel* v. *Remington Arms Co.* (1972) 24 Cal.App.3d 711, 724 [101 Cal.Rptr. 314] (*Kasel*); see *Fortman* v. *Hemco, Inc.* (1989) 211 Cal.App.3d 241, 251-252 [259 Cal.Rptr. 311]; *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 50-52 [46 Cal.Rptr. 552]; see also *Edwards* v. *A.L. Lease & Co.* (1996) 46 Cal.App.4th 1029, 1033 [54 Cal.Rptr.2d 259] ["In a product liability action, every supplier in the stream of commerce or chain of distribution, from manufacturer to retailer, is potentially liable."].) Courts applying laws from other states have also extended the doctrine to parties who were not in the actual vertical distribution chain. (See, e.g., *Weber* v. *Johns-Manville Corp.* (D.N.J. 1986) 630 F.Supp. 285, 288-289; *Taylor* v. *General Motors, Inc.* (E.D.Ky. 1982) 537 F.Supp. 949, 950-954; *Bittler* v. *White and Co., Inc.* (1990) 203 Ill.App.3d 26 [148 Ill.Dec. 382, 560 N.E.2d 979, 981]; *Brumbaugh* v. *CEJJ, Inc.* (1989) 152 A.D.2d 69 [547 N.Y.S.2d 699, 700-701].) Imposing strict liability under these circumstances is "an expression of policy that once an entity is instrumental in placing a defective product . . . into the stream of commerce, then liability [should] attach[] without regard to conduct (fault)." (*Kasel*, *supra*, 24 Cal.App.3d at p. 733.)

■ In applying this stream of commerce theory, the courts have eschewed legal labels and have taken a very practical approach, focusing on the actual connection between the defendant's activities and the defective product. (See *Kasel, supra*, 24 Cal.App.3d at pp. 723-728; *Torres* v. *Goodyear Tire & Rubber Co., Inc.* (9th Cir. 1990) 901 F.2d 750, 753 (conc. opn. of Noonan, J.) [applying Arizona law]; see also *Brumbaugh* v. *CEJJ, Inc., supra*, 547 N.Y.S.2d at p. 701.) Thus, strict liability may attach even if the defendant did not have actual possession of the defective product or control over the manner in which the product was designed or manufactured. (See *Kasel, supra*, 24 Cal.App.3d at pp. 725-726; *Canifax* v. *Hercules Powder Co., supra*, 237 Cal.App.2d at pp. 50-52; *Weber* v. *Johns-Manville Corp., supra*, 630 F.Supp. at p. 288.) Likewise, the defendant's legal status or formal relationship with the manufacturer or the consumer is not dispositive. (See *Kasel, supra*, 24 Cal.App.3d at p. 725; *Garcia* v. *Halsett, supra*, 3 Cal.App.3d at p. 325; *Taylor* v. *General Motors, Inc., supra*, 537 F.Supp. at p. 953.)

However, while the courts have expansively described the reach of this stream of commerce or marketing enterprise theory, the imposition of strict liability based on the theory is not limitless. Most significantly, courts have been mindful that the strict liability doctrine derives from judicially perceived public policy considerations and therefore should not be expanded beyond the purview of these policies. Thus, the courts have refused to hold a defendant strictly liable where the policy justifications are not applicable even if the defendant could be technically viewed as a "link in the chain" in getting the product to the consumer market. (See *Peterson* v. *Superior Court* (1995) 10 Cal.4th 1185 [43 Cal.Rptr.2d 836, 899 P.2d 905] [determining landlords and hotel proprietors are not strictly liable for product defects based on court's conclusion the policy justifications underlying the doctrine are inapplicable]; *Tauber-Arons Auctioneers Co.* v. *Superior Court* (1980) 101 Cal.App.3d 268, 281-282 [161 Cal.Rptr. 789] [secondhand dealer is not strictly liable for a defective used product].)

■ The decisions addressing strict liability in the trademark licensor context help illustrate the boundaries of the strict liability doctrine as applied to an entity outside the vertical distribution chain. In a widely cited California decision, a defendant (Remington) licensed its trademark to a Mexican firearm ammunition manufacturer (CDM). (*Kasel, supra*, 24 Cal.App.3d 711.) A plaintiff injured by a defective CDM shell brought a strict liability action against Remington. The evidence established Remington owned 40 percent of CDM stock and had substantial control over CDM's manufacturing and organizational processes. (*Id.* at pp. 717-720, 739-740.) The *Kasel* court held Remington strictly liable, explaining that "Remington had more

involvement in the enterprise which produced the defective shell than the typical retailer, distributor or wholesaler upon whom the courts have had no trouble imposing strict liability." (*Id.* at p. 727.) The court, however, "stress[ed] . . . that [its] decision [was] confined to the specific facts of this case," including that Remington retained rights of control over the quality of CDM's product. (*Id.* at p. 739.)

Consistent with *Kasel*, courts in other states have recognized that a trademark licensor is not per se strictly liable for its licensee's defective product, but a licensor may be subject to strict liability if it " 'participate[d] in the overall process by which the product reache[d] [the] consumers, and . . . [had] the right to control the incidents of manufacture or distribution . . . .' " (*Torres* v. *Goodyear Tire & Rubber Co., Inc., supra,* 901 F.2d at p. 751; accord, *Firestone Steel Products Co.* v. *Barajas* (Tex. 1996) 927 S.W.2d 608, 613-614, 616; *Harrison* v. *ITT Corporation* (1993) 198 A.D.2d 50 [603 N.Y.S.2d 826]; *Burkert* v. *Petrol Plus of Naugatuck, Inc.* (1990) 216 Conn. 65 [579 A.2d 26, 32, 35, 90 A.L.R.4th 961]; *Hebel* v. *Sherman Equipment* (1982) 92 Ill.2d 368 [65 Ill.Dec. 888, 442 N.E.2d 199, 204-205] (*Hebel*); *City of Hartford* v. *Associated Const. Co.* (Conn. 1978) 384 A.2d 390, 393-397; see generally, Annot., Trademark Licensor Liability (1991) 90 A.L.R.4th 981.) While these courts have cited consumer reliance on the trademark name as a factor in imposing the liability, the courts have additionally analyzed the issue based on the policies underlying the stream of commerce theory. (See *Hebel, supra,* 442 N.E.2d at pp. 204-205; *Burkert* v. *Petrol Plus of Naugatuck, Inc., supra,* 579 A.2d at p. 33, fn. 11.) Citing *Kasel*, these courts have reasoned that where a licensor maintains significant involvement in the distribution or manufacturing process, the policies underlying the doctrine are implicated, including that the defendant is in a position to deter unsafe products and to spread the risk of loss. (See *Torres* v. *Goodyear Tire & Rubber Co., Inc., supra,* 901 F.2d at pp. 754-757 (conc. opn. of Noonan, J.); *Hebel, supra,* 442 N.E.2d at pp. 204-205; *Taylor* v. *General Motors, supra,* 537 F.Supp. at pp. 952-954.) Where, however, a licensor does not obtain a financial benefit or the defendant's activities were peripheral to the distribution process, it would be unfair to impose strict liability. (See *Firestone Steel Products Co.* v. *Barajas, supra,* 927 S.W.2d at p. 616 ["strict liability demands more than an incidental role in the overall marketing program of the product"]; *Hebel, supra,* 442 N.E.2d at p. 205; *Harmon* v. *National Automotive Parts Assn.* (N.D.Miss. 1989) 720 F.Supp. 79, 81.)[7]

Viewing the existing case law and the policies underlying the doctrine, we agree with Shell that the mere fact an entity "promotes" or

---

[7]We recognize many of these trademark cases are distinguishable in that Shell did not place its name on the polybutylene plumbing system and that, unlike in most of these cases, Shell did not have a formal role in controlling the quality of the manufactured product. The cases

"endorses" or "advertises" a product does not automatically render that entity strictly liable for a defect in the product. (See *Hanberry* v. *Hearst Corp.* (1969) 276 Cal.App.2d 680, 687-688 [81 Cal.Rptr. 519, 39 A.L.R.3d 173]; *Harmon* v. *National Automotive Parts Assn.*, *supra*, 720 F.Supp. at p. 81.) It would be unlikely that such defendant could significantly affect product safety or that the defendant could effectively spread the risk of the cost of protection.

But we disagree with Shell to the extent it is arguing that an entity involved in the marketing process, but outside the vertical distribution chain, may never be strictly liable regardless of the factual circumstances. The imposition of strict liability depends on whether the facts establish a sufficient causative relationship or connection between the defendant and the product so as to establish that the policies underlying the strict liability doctrine are satisfied. Specifically, a defendant involved in the marketing/distribution process has been held strictly liable if three factors are present: (1) the defendant received a direct financial benefit from its activities and from the sale of the product; (2) the defendant's role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process. (See *Kasel*, *supra*, 24 Cal.App.3d at p. 711.)

■ Viewing the evidence in the light most favorable to plaintiffs, plaintiffs presented evidence as to each of these three elements. First, there was evidence that as a supplier of resin, Shell directly profited from its activities in creating a market for the polybutylene plumbing system and from each sale of the plumbing system. Second, there was evidence Shell played a dominant role in creating the market for polybutylene pipe and the polybutylene plumbing system and in aggressively escorting the plumbing product from the manufacturing plant to the consumer marketplace. Indeed, a properly instructed jury could reasonably infer the plumbing system would never have reached the consumer market without Shell's participation. Third, there was evidence Shell had a strong continuing business relationship with the manufacturers and that Shell had a substantial ability to influence the manufacturers' production and distribution decisions. Shell further directed much of the manufacturers' marketing strategy and was involved in selling the polybutylene plumbing system directly to plumbers and homebuilders.

---

have made clear, however, that neither of these factors was determinative. Where a licensor or franchisor's marketing activities render the defendant an integral part of the entire business enterprise, strict liability has been imposed, regardless of the defendant's specific connection to the source of the defect. "To hold otherwise would shift the focus [in a strict liability action] from the product itself to an individual defendant's conduct." (*Fortman* v. *Hemco, Inc.*, *supra*, 211 Cal.App.3d at p. 252.)

Under plaintiffs' evidence, Shell was not merely a supplier of a raw material or a marketing consultant. Rather, Shell actively injected itself into the overall marketing enterprise of the final plumbing product and became a dominant player in that enterprise. To the extent Shell's participation in bringing the defective product to market was remote compared to the manufacturers' role in creating the defect, such factor is relevant in assessing Shell's ultimate responsibility for plaintiffs' damages under comparative fault principles.

We reject Shell's contention that as a matter of law it could not be held strictly liable for defects in the polybutylene plumbing system.

## II. *Jury Instructions*

Shell alternatively argues the judgment should be reversed because the court did not properly instruct on the elements of strict liability. We agree.

Over Shell's objections, the trial court gave the jury various instructions on the scope of strict liability, informing the jury it could find Shell strictly liable if Shell: (1) was a "manufacturer of a product" and was "an integral part of the marketing scheme of the defective plumbing system"; (2) had a "participatory connection, for [its] personal profit, or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product"; (3) was a "link in the chain of getting goods from the manufacturer to the ultimate user or consumer"; and (4) "mutually participated, in a dependent and interrelated way, in designing or assembling or marketing the defective product."[8] Based on these instructions, the jury found Shell strictly liable for the defects in the Celcon fittings used in the polybutylene plumbing system.

---

[8]Instruction No. 32 stated that to establish "strict liability, plaintiff has the burden of proving: 1. That defendant was the manufacturer of a product; 2. This same product was defective; 3. This defect existed when the product left the possession of the defendant *or defendant was an integral part of the marketing scheme of the defective plumbing system*; 4. This defect in this same product caused damages to plaintiff; 5. These damages resulted from a reasonably foreseeable use of the product; and, 6. The nature and extent of these damages." (Italics added.)

Instruction No. 39 stated: "No precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required to impose strict liability. *It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product that calls for the imposition of strict liability.*" (Italics added.)

Instruction No. 40 read: "*Strict liability is applicable to such entities which are a link in the chain of getting goods from the manufacturer to the ultimate user or consumer. It is applicable to all parties who have mutually participated, in a dependent and interrelated way, in designing or assembling or marketing the defective product.*" (Italics added.)

These instructions, taken essentially verbatim from several appellate decisions,[9] were far too broad and were misleading. The fact an entity was a "link in the chain of getting goods" to the market or that it "particpat[ed]" in marketing a defective product is not enough to establish the defendant should be held strictly liable. Rather, where liability is premised on the marketing enterprise theory, a plaintiff must establish (1) the defendant received a direct financial benefit from its activities and from the sale of the product; (2) the defendant's role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process. The jury instructions here did not limit the application of the strict liability doctrine to such factors.

■ "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.] . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

■ Viewing the record, it is undisputed Shell received a direct financial benefit from its activities and from the sale of the polybutylene plumbing system. However, the evidence was conflicting as to Shell's role in the process, particularly whether Shell had control over the manufacturing or distribution process and whether it was an integral factor in bringing the polybutylene plumbing system to market. While we have generally set forth the facts in the light most favorable to plaintiffs, Shell presented evidence from which a reasonable juror could have inferred that Shell was not a dominant actor in the enterprise and therefore strict liability should not attach. As instructed, this jury was given virtually no guidance on what must be established to hold a defendant strictly liable where liability is based on the stream of commerce or marketing enterprise theory. Having evaluated the evidence and the instructions, we believe it probable the instructional error "prejudicially affected the verdict."[10]

Accordingly, the jury instruction error requires that we reverse the judgments on plaintiffs' strict liability claims.

---

[9]Although appellate opinions are an important source of jury instructions, trial courts should use great care in lifting statements from opinions since such statements taken out of context may be inappropriate as a general rule of law, particularly if the facts underlying the opinion are distinguishable. (See *Ernest W. Hahn, Inc.* v. *Sunshield Insulation Co.* (1977) 68 Cal.App.3d 1018, 1023 [137 Cal.Rptr. 732].)

[10]The issue whether a defendant falls within the scope of the strict liability doctrine generally is a question of law (see *Kasel, supra,* 24 Cal.App.3d at p. 723, fn. 13). However,

### III. *Alleged Evidentiary Errors*

Shell additionally asserts the trial court made numerous evidentiary errors in permitting various items of evidence to be presented to the jury. Because we are reversing the judgment, we need not rule on these contentions. We note that most of the challenged evidence was admitted primarily to support plaintiffs' fraud claims. Thus, our ruling on these contentions at this time would be unlikely to aid the court or the parties on a retrial of the strict liability claims.

### DISPOSITION

The judgments on plaintiffs' fraud causes of action are reversed and the court is directed to enter judgment in favor of Shell on these claims. The judgments on plaintiffs' strict liability claims are reversed. The parties to bear their own costs on appeal.

Work, Acting P. J., and McDonald, J., concurred.

---

the issue becomes a factual one where the facts regarding the extent of the defendant's participation in the enterprise are disputed.